**ANGLO-AMERICAN EXTRUSION COMPANY, Plaintiff,**

v.

**David L. LADD, Commissioner of Patents, Defendant.**

**Civ. A. No. 2369-62.**

United States District Court
District of Columbia.

Jan. 22, 1964.

Andrew E. Taylor, Larson & Taylor, Washington, D. C., for plaintiff.

Clarence W. Moore, Solicitor, Washington, D. C., for defendant.

JACKSON, District Judge.

This civil action was heard on November 27, 1963 and December 2, 1963, and the Court having considered all the evidence presented, including the record in the Patent Office and the arguments of counsel, entered judgment for plaintiff.

In accordance with the Federal Rules of Civil Procedure Rule 52(a), 28 U.S.C., the Court makes the following Findings of Fact and Conclusions of Law:

FINDINGS OF FACT

1. The plaintiff, Anglo-American Extrusion Company, is a Delaware Corporation, having a principal place of business at Arlington, Virginia.

2. Defendant is the Commissioner of Patents.

---

3. This action arose under the patent laws of the United States pursuant to the provisions of Section 145, Title 35 U.S.Code, and is based upon the refusal of the Commissioner of Patents to grant Letters Patent to Archibald Claude Bridge upon an application for Letters Patent Serial No. 551,153, filed February 26, 1955, of which the plaintiff is the sole owner of the entire right, title and interest.

4. The Bridge application before the Court, Serial No. 551,153 is a continuation-in-part of an application Serial No. 506,063, which in turn had earlier antecedent applications, all of which are recited in the application oath of Serial No. 551,153.

5. The plaintiff owns the entire right, title and interest in and to the application here involved, Serial No. 551,153, and to each and every invention therein disclosed, by reason of the assignment by the inventor Archibald Claude Bridge to Crittal-Luxfer Limited, a company organized under the laws of Great Britain, of Colwick, near Nottingham, England, dated November 16, 1955, and recorded in the Title Records of the United States Patent Office on December 5, 1955, Reel 121, Frames 268 and 269, and by reason of an assignment by Crittal-Luxfer Limited to Anglo-American Extrusion Company, the plaintiff, dated November 16, 1955, and recorded in the Title Records of the United States Patent Office on December 5, 1955, Reel 121, Frames 252, 253 and 254.

6. During the prosecution in the Patent Office the Examiner finally rejected claims 18, 19, 20, 21, 22, 24, 25 and 26 of the application Serial No. 551,553, said claims then being the only claims remaining in said application. An appeal was taken to the Board of Appeals of the United States Patent Office which, in a decision rendered on May 28, 1962, refused to allow said claims. Upon such refusal, the plaintiff, assignee of Applicant's rights, brought this action in accordance with the provisions of Section 145, Title 35 of the United States Code.

7. The invention in issue is in the field of forming metal articles by deforming the metal under pressure. If metal in a cold state is "worked", that is, plastically deformed, it will strain-harden or work-harden. In laymen's language, the working causes the metal to become rigid and thus to resist further deformation. If metal is heated to a certain degree it can be plastically worked or deformed without any strain-hardening or work-hardening occurring.

8. The Bridge invention before the court relates to the extrusion of metals by forcing them under pressure through a die orifice. There are two types of extrusion, (1) "hot" extrusion, in which metal is forced through a die after having been preheated to a plastic or semi-plastic condition so that no appreciable cold working takes place during the extrusion operation and no recognizable work hardening exists in the extruded product; and (2) "cold" extrusion, in which the temperature of the billet metal is so low that forcing the metal through the extrusion die with accompanying plastic deformation results in cold working, and imparts work hardened properties to the extruded product.

9. While the cold working of metals imparts certain desirable physical properties to the metal article produced, and while pure cold working processes are often more economical, the fact that metals do strain-harden when deformed cold, as when being extruded cold, has imposed severe limitations on cold extrusion processes. The reason is that before the metal could be extruded through the die orifice the metal within the die cavity would become strain-hardened to the point that it prevented further extrusion. The pressure applied would then break the die, or the press itself. Because of this, prior to the Bridge invention, it was not possible to cold extrude articles of any substantial length by a single stroke cold extrusion.

10. The restrictions of cold extrusion to articles of short lengths imposed by the strain-hardening occurring in the die cavity before the metal was extruded

through the die orifice, constituted a serious problem. The prior art made many attempts to solve this problem by different means, such as by improving the die design, increasing the strength of the die material, partial pre-heating of the billets, lubrication, and increased press speeds. The evidence is clear that, prior to the Bridge invention, regardless of such attempts, the longest cold extrusions possible by any single stroke extrusion process were relatively short.

11. The prior art disclosures relating to truly single stroke cold-extrusion show that prior to the Bridge invention the only single stroke cold extrusions of strain hardenable metal at temperatures at which the metal was strain hardenable throughout the single stroke, were usually limited to the production of extruded products from billets which were relatively short in the direction of extrusion and which often were mere discs, wafers or cup-shaped pre-formed blanks, or the like.

12. Prior to the Bridge invention it was not possible and indeed it was not thought to be possible to produce extruded articles of substantial lengths or high extrusion or extension ratios by a single step cold-extrusion process. The Bridge invention has removed the restrictions on single stroke cold extrusions which have been accepted as unavoidable by prior workers in the art, and has made it possible to produce by single stroke cold extrusion, without limitation as to the volume of the billet and the total time of the extrusion operation, strain-hardened extruded products at extremely high extension or extrusion ratios up to any length within the limits imposed by the size of the chamber from which the billet metal is extruded.

13. One phenomenon upon which the Bridge process is based is what is referred to in the application as time delay before setting in of strain hardening of a metal which is plastically deformed when in strain hardenable condition. Another phenomenon upon which the Bridge process is based is that when a metal billet of any substantial size is extruded cold through a die under substantial pressure, only a portion or segment of the billet metal which is adjacent the die orifice becomes plastically deformed. When a billet is forced through a die, work-hardening therefore sets in only in a portion of the billet at any time adjacent to the die aperture, and the metal more remote from the die aperture and closer to the ram undergoes little if any plastic deformation. In accordance with the Bridge process, a billet of any length may be considered as comprising successive portions, and cold-extrusion of billets of any length may be effected provided that such successive billet portion is forced through the extrusion die within a time less than the time required for work-hardening to set-in in that billet portion after deformation of that portion occurs. This is true even though the total time for performing a single stroke extrusion operation is greater than the time delay before setting in of strain hardening.

14. Generally, the Bridge process is a cold-extrusion process which comprises (1) initiation of a single extrusion stroke and (2) continuation of the stroke to the completion of the extrusion, both the initiation and the continuation being within a range of velocities the lowest of which is equal to or greater than a critical minimum velocity, the billet metal being initially and throughout the extrusion operation under a temperature which continues the metal in strain hardenable condition throughout the single extrusion stroke. The critical minimum velocity is defined in the application and in the claims as the lowest velocity which when maintained throughout a single extrusion stroke in the extrusion of a billet of a particular metal in strain hardenable condition at a predetermined extrusion ratio will result in continuously expressing the successive plastically deformed portions of the billet from the extrusion die without causing a rise in resistance to forcing the metal out of the die cavity even though the total time for performing the single stroke operation is greater than the time delay before setting-in of strain

hardening of each successive portion of the billet brought adjacent the die aperture.

15. The single stroke cold-extrusion process according to the Bridge invention permits the formation of elongated extruded metal sections of remarkable lengths. For example, the testimony showed that the Bridge process had been used to extrude in a single stroke a 3 inch pipe 60 feet in length and with a wall thickness of only .035 inches, from an aluminum billet 12.5 inches in length and 6 inches in diameter. Other testimony related to pipes of up to 80 feet in length.

16. The essential points of the Bridge method are as follows:

(1) The billet metal must be in strain hardenable condition at the beginning of the extrusion operation and must remain in strain hardenable condition throughout the entire extrusion operation.

(2) The extrusion stroke once initiated must be carried on continuously until the completely extruded section has been formed without any stoppage, intermediate annealing or subsequent extrusion strokes.

(3) The extrusion velocity at the beginning and throughout the single stroke extrusion operation must be within a range of velocities, the lowest of which is at or above the critical minimum velocity and the highest of which yet produces strain hardening within the product. The critical minimum ram velocity is the lowest velocity which when maintained throughout a single extrusion stroke for the particular metal at a predetermined extrusion ratio will result in continuously expressing the successive plastically deformed portions of the billet from the extrusion die within a time period less than the time delay required for work-hardening to set-in in that portion of the billet, even though the total time for performing the single stroke extrusion operation is greater than the time delay before setting-in of strain hardening of each successive portion of the billet brought adjacent the die aperture.

17. Although a number of prior publications were a record during the prosecution of the application in the Patent Office, the Board of Appeals in its decision relied on one prior publication, and the defendant, Patent Office, in this case also has relied on that same publication. It is Jevons, The Metallurgy of Deep Drawing and Pressing, Second Edition, 1940, published by John Wiley and Sons, Inc., 440 Fourth Avenue, New York, pages 543–551 and 622–625. During the final argument the Patent Office Solicitor also referred (with consent of the Court and plaintiff's counsel) to another publication, namely, Pearson, The Extrusion of Metals, First Edition, 1944, published by John Wiley and Sons, Inc., 440 Fourth Avenue, New York. The Patent Office Solicitor referred only to short portions of this Pearson publication in which reference was made to Jevons, the Jevons publication, and to the prior art cold impact extrusion as disclosed in Jevons.

18. With respect to the Jevons publication, the Board of Appeals simply took the position that the disclosure, particularly that which appears on page 551, and the description of the prior art cold-impact extrusion which appears on pages 622–625 of Jevons, would convey the Bridge invention to one skilled in the art, and that the differences over Jevons would be obvious to one skilled in the art.

During the trial the defendant took the same position with respect to the Jevons publication as did the Board of Appeals of the Patent Office in its decision. This was to the effect that Jevons on page 551 (having previously commented that work-hardening seems for some unexplained reason to take time) states that this leads to the obvious and intriguing conclusion that if deformation could be carried out in so short a space of time that the full effect of work-hardening could not become manifested, a quite abnormal degree of deformation might become possible. The Jevons' publication continues on to point out that this object is "actually achieved in the industrial process of impact-extrusion described in a later chapter (pages 622–625 are part

of that chapter), "for it is undoubtedly the time-lag in manifestation of work-hardening effects which renders possible the quite remarkable amounts of plastic reformation which can be accomplished in this interesting process" (the prior art cold impact extrusion).

19. During the prosecution of the application in the Patent Office and before the Board of Appeals, there was much discussion as to whether the Jevons understanding of "time delay" was the same as applicant's understanding of that term. Applicant had urged that apparently there was an initial period in which no work-hardening at all took place while the Jevons understanding was apparently that at least a small amount took place almost if not immediately. The Board of Appeals indicated that regardless of which was correct it did not make any difference to a determination of this case since applicant's process was shown by Jevons. Plaintiff during the trial agreed that the important point is that regardless of the interpretation of the phenomena, the cold extrusion in accordance with the Bridge process is effected prior to any appreciable work-hardening taking place within the die cavity.

20. The Jevons publication did not suggest or teach the Bridge invention to one of ordinary skill in the art of cold extrusion and the Bridge invention as described and claimed in the application distinguishes in a clear and unobvious manner from Jevons and from any prior art cold-impact extrusion process disclosed to the Court.

21. Neither the Jevons publication, nor the Pearson publication, nor the cold impact extrusion methods referred to therein, teach, show or suggest a cold extrusion method in which a billet of any length can be extruded by a single extrusion stroke in which the stroke is (1) initiated under pressure at substantially critical minimum velocity, and (2) the stroke is continued and maintained throughout the extrusion at or above such velocity, thus making it possible to cold extrude articles the length of which need only be limited by the size of the billet employed, and the size and capacity of the press.

22. Plaintiff at the trial produced two distinguished witnesses both of whom testified to the effect that the Jevons publication did not disclose, teach or suggest to one of ordinary skill in the art at the time the invention was made the essential elements of the Bridge process. One of these witnesses was Professor Robert B. Pond of Johns Hopkins University, a metallurgist of renown particularly in the field of plastic deformation of metals, a phenomenon which is involved in the present case. The other witness was Dr. John Dudley Jevons, the author of the publication which is relied upon by the Patent Office, who came here from England for the purpose of pointing out that he never regarded his publication, and particularly the statement relied upon by the Board of Appeals of the Patent Office, as in any way teaching or suggesting the Bridge process as disclosed in the application and as set forth in the claims before the Court.

23. The testimony was clear that if indeed the Jevons publication teaches the art anything concerning improving cold extrusion processes, it would be that in order to cold extrude a relatively long billet one should attempt to extrude all of the billet in the same length of time normally used to impact extrude the wafer or disc billets of the prior art. This procedure is very different from the Bridge invention and was tried many times in the past. It was found to be impossible to cold extrude billets of any substantial size by such a procedure.

24. Dr. J. Dudley Jevons is a very outstanding metallurgist. Recently retired and engaging in consulting work, he was at the time of the Bridge invention the chief metallurgist for Joseph Lucas Industries in England, a company having some 58,000 employees, and about 139 metallurgists under his supervision and jurisdiction. Prior to having any association with this Bridge application or

even knowing that the Bridge process application in the United States had been refused on the basis of his publication, Dr. Jevons learned of some very surprisingly long cold extrusions which were being made at the company where Bridge was employed in England. He went to the plant and saw the Bridge process in operation, and his testimony was to the effect that what he saw was truly "astounding", particularly in that it was possible by a single stroke cold-extrusion to extrude from a billet of about 16 inches an aluminum tube about 60 to 80 feet in length. It was his clear testimony that his publication did not suggest to him the Bridge invention, and the Court finds that it did not in fact suggest the Bridge invention to others who were skilled in the art, even though there were substantial efforts throughout the world to obtain a cold-extrusion process cold-extrusion pieces of substantial length.

25. The essential steps of the Bridge invention as distinguished from the prior art are set forth in claims 19, 20, 21, 22, 24 and 26. These claims define the Bridge invention in a manner so as to distinguish it clearly and patentably from Jevons and the cold impact extrusion.

26. Claims 19, 20, 21, 22, 24 and 26 in issue are directed to the Bridge method of cold extrusion of metals, and in varying degrees of specificity define patentably over the Jevons publication and over prior art cold impact extrusion processes by reciting that the method is a cold extrusion process and is a single stroke method, in which the stroke is initiated at or above a critical minimum velocity, the stroke being maintained at or above such critical minimum velocity throughout the extrusion stroke to produce a work-hardened product. Each of these claims defines the critical minimum velocity, and each brings out that the process is independent of the total time to complete the extrusion stroke so long as the ram velocity is maintained within specified limits.

27. The subject matter of claims 19, 20, 21, 22, 24 and 26, in issue has been regarded by industry as outstanding and extraordinary and is the method practiced commercially with much success.

28. The Bridge invention here involved, constitutes a substantial advance in the art of cold extrusion of metals.

29. Claims 19, 20, 21, 22, 24 and 26 are patentable over the prior art.

30. Claim 18 fails to point out and distinctly claim the subject matter of applicant's invention. This claim recites a method which is defined not by positive method steps but by an indefinite result. That result is set forth as a product "comparable to" the definitely described product of a definitely recited method.

31. Claim 25 is a product claim defined in terms of the method of making the product. The claim is not limited to a cold extrusion process, and thus fails to particularly point out and distinctly claim applicant's invention.

CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this action.

2. The differences between the subject matter sought to be patented in Claims 19, 20, 21, 22, 24 and 26 and the prior art are such that the subject matter as a whole would not have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains.

3. The application in suit as pertains to the subject matter of this action complies with the requirements of 35 U.S.C. § 103.

4. Claim 18 is unpatentable as failing to meet the requirements of 35 U.S.C. § 112, Paragraph 2.

5. Claim 25 is unpatentable as failing to meet the requirements of 35 U.S.C. § 112, Paragraph 2.

6. Claims 19, 20, 21, 22, 24 and 26 define a novel and patentable combination of method steps.

7. Plaintiff is entitled to a patent containing Claims 19, 20, 21, 22, 24 and 26.